UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FIRST INTERNET BANK OF INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-0869-DFH-DML |
| | ) | |
| LAWYERS TITLE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

First Internet Bank has sued Lawyers Title Insurance Company alleging contract and tort claims arising from Lawyers' issuance of a title insurance policy to First Internet. Lawyers insured that First Internet had the senior lien on several lots that a third party, Royal Haven Builders, Inc., used to secure a loan from First Internet. Royal Haven went bankrupt and the lots were sold in foreclosure sales. It turned out that First Internet did not have the senior lien on many of the lots, and it did not receive any proceeds from the foreclosure sales on these lots. Lawyers has paid First Internet on the title insurance policy for these lots, but First Internet claims that Lawyers has not paid enough. First Internet also claims that Lawyers is responsible for alleged torts of the company that handled the loan closing with Royal Haven. The court has diversity jurisdiction under 28 U.S.C. § 1332.

Lawyers has moved for summary judgment on all of the claims against it, and First Internet filed a cross motion on the contract claims and some of the tort claims.  Lawyers is entitled to summary judgment on all claims.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255.  However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record.  *Id.* at 251-52.

*Undisputed Facts*

The following facts apply to each party's motion for summary judgment. There are no disputed issues of fact material to the issues the court finds dispositive.   In the early 1990s, First Internet began lending money to Royal Haven Builders to permit Royal Haven to purchase real property and develop residential real estate during a real estate boom in Hendricks County.   First Internet Rule 30(b)(6) Dep. 11.[1]  This case stems from one transaction in which Royal Haven issued a promissory note to First Internet on October 5, 2001 with a principal of $719,400.   Dkt. No. 34, Ex. 1.   The note was secured by four mortgages, which each covered multiple lots.   Dkt. No. 34, Ex. 2.

In connection with this transaction, Lawyers issued a title insurance policy to First Internet dated October 21, 2001.   Maser Aff. ¶ 5.   The policy insured First Internet against "any defect in or lien or encumbrance" on the titles to the lots. Dkt. No. 29, Ex. A.   The policy did not insure the value of the lots.   Maser Aff. ¶ 6. The policy excluded all "defects, liens, encumbrances, adverse claims or other matters created, suffered, assumed, or agreed to by the insured."  Dkt. No. 29, Ex. A at 1.   The policy set limits on liability.   The limit was the lesser of the face amount of insurance, the amount of unpaid principal indebtedness secured by the

---

[1]First Internet is the successor to Landmark Savings Bank.  The briefs and evidence in this case refer to Landmark rather than First Internet because Landmark was the entity that entered into the loan with Royal Haven and the policy with Lawyers.   To avoid confusion, however, the court refers to First Internet, the named plaintiff.

insured mortgages, or "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."  *Id.* ¶ 7(a).

While the title insurance policy was issued in Lawyers' name, Abstract & Title Company issued the policy as Lawyers' agent.  Abstract regularly wrote title insurance policies in Lawyers' name.  Comer Dep. 24.  Lawyers and Abstract entered into an agency agreement in 1977.  Lawyers Rule 30(b)(6) Dep. 21.  The agreement said that Abstract was Lawyers' agent "solely for the purpose of issuing on [Lawyers'] forms interim title insurance binders, commitments to insure or preliminary title reports . . . policies of title insurance and other Principal-approved insurance contracts . . . ."  Lawyers Rule 30(b)(6) Dep. Ex. 16.  Loan closings were not a part of the agency agreement between Abstract and Lawyers.  Comer Dep. 82-83; Lawyers Rule 30(b)(6) Dep. 55.  The agency agreement permitted Lawyers to control how Abstract issued Lawyers' title policies, but Lawyers did not have the right to tell Abstract how to conduct closings.  Comer Dep. 71-72; Steckler Dep. 121; Lawyers Rule 30(b)(6) Dep. 89-90.

When Abstract issued Lawyers' policies, it also performed loan closings on behalf of Lawyers "as a part of the transaction."  Comer Dep. 24-25.  Abstract closed the loan between First Internet and Royal Haven.  Abstract received a $400 closing fee.  None of that money went to Lawyers.  Comer Dep. 78.  Before the loan closing, Abstract issued a Lawyers' title insurance commitment that identified

-4-

First Internet as the proposed insured on the mortgages for the lots.  Perfetti Aff. ¶ 10.  First Internet issued closing instructions to Abstract.  First Internet Rule 30(b)(6) Dep. 16.  The instructions provided that the "loan is subject to the following conditions:  all prior liens against subject property shall be paid."  Dkt. No. 59, Ex. C, Att. 1.  First Internet understood that Abstract would follow this instruction, and it disbursed the loan principal ($719,400) to Abstract based on this understanding.  Perfetti Aff. ¶ 12.[2]  Abstract held this money in escrow.  An Abstract document provided by First Internet's Rule 30(b)(6) representative stated that Abstract "has a fiduciary responsibility for processing, safeguarding, and accounting for all funds held for the benefits of others."  Dkt. No. 60, Tab E, Ex. 31 at 5.  Lawyers provided no closing instructions to Abstract, and Abstract did not forward First Internet's instructions to Lawyers.  Comer Dep. 75, 77; Steckler Dep. 60.

Abstract did not close First Internet's loan to Royal Haven properly.  If Abstract had followed First Internet's instructions and closed the loan properly, First Internet would have had the senior interest on all of the lots used to secure the loan.  Abstract Rule 30(b)(6) Dep. 115.  Abstract had a problem with one of its closing agents, Mara Vittetow.  In advance of this closing, Abstract gave Vittetow checks to pay off all prior liens so that First Internet would have the senior liens.

---

[2]Lawyers objects to this portion of Perfetti's affidavit because he testified in his Rule 30(b)(6) deposition for First Internet that he had no knowledge of the transaction between First Internet and Abstract.  This objection may have merit, but it is reasonable to assume that a lender would expect a closing agent to follow instructions to remove prior liens before disbursing loan funds.

Vittetow often failed to follow Abstract's loan closing procedures.  In transactions with Royal Haven, Vittetow often gave these checks directly to Royal Haven's president, Eric Tauer (who cashed them himself), contrary to Abstract's procedure. Comer Dep. 47.[3]  The parties did not designate evidence establishing that this is what occurred in this case, but their arguments assume that Vittetow gave checks to Tauer that she should have used to remove senior liens on the lots that secured First Internet's loan.  As a result First Internet had the senior lien on only some, not all, of the lots used to secure its October 5, 2001 loan to Royal Haven.

On December 3, 2002, Royal Haven filed for bankruptcy.  Maser Aff. ¶ 10. The bankruptcy court permitted the trustee to sell some of Royal Haven's real property.  Dkt. No. 34, Ex. 6.  The court required the trustee to file a motion to sell each parcel and to serve the motion on all parties with liens on the parcel.  *Id.* at 3-4.  Interested parties could object to the sales.  *Id.* at 4.  The court also required the trustee to file a distribution of proceeds notice upon the sale of each parcel. *Id.* at 8.  The trustee had to serve the notice on all interested parties, and lien holders had twenty days to object to the distribution.  *Id.*  First Internet did not object to the trustee's sales of any lots.

First Internet received the proceeds of the trustee's sales of lots for which it actually had the senior lien.  In total, the trustee has paid First Internet

---

[3]Tauer has since pled guilty to federal charges of bank fraud and conspiracy, and this court sentenced him to seventy-eight months in prison.

$136,258.06 for these lots.[4]  When the trustee sold lots on which Abstract had failed to ensure that First Internet had a senior lien, First Internet received nothing from the foreclosure sales.  Lawyers then stepped in as the title insurer and paid First Internet the same amount that the bankruptcy trustee paid to the party with the senior lien on the lot after each of those sales.  These payments totaled $277,354.33.  Maser Aff. ¶ 14.  First Internet also received $40,000 through Abstract from an interpleader action, and it applied this money to the Royal Haven note.  Dkt. No. 34, Ex. 13; First Internet Rule 30(b)(6) Dep. 48-49. The principal dispute in this lawsuit is whether these sums were sufficient to comply with Lawyers' contractual obligation to First Internet.

One lot used to secure the note remains to be sold.  First Internet has a junior lien on the lot, Harvest Ridge Lot 139, and in light of current market conditions will not receive any proceeds from its sale.  Perfetti Aff. ¶¶ 24, 25.  Lot 139 is titled to an affiliate of Royal Haven, RHI, LLC, that was not a debtor in the bankruptcy proceeding that led to the sale of the other lots.  Perfetti Aff. ¶ 23.  In another minor complication, First Internet had two liens on one lot, Harvest Ridge Lot 80.  It had a senior lien securing another note and a junior lien securing the Royal Haven note.  Perfetti Aff. ¶¶ 26, 27.  First Internet did not apply the proceeds it received for this lot to the Royal Haven note.  Perfetti Aff. ¶ 28, 29. Lawyers has not paid First Internet for Lot 80.  First Internet omitted Harvest

---

[4]The parties did not designate evidence establishing this number, but they agree to it.

Ridge Lot 80 from a complaint attachment that listed lots that serve as the basis of its contract claim against Lawyers.  Additional facts are noted below as needed, keeping in mind the standard for summary judgment.

*Discussion*

I.   *Breach of Contract Claim*

First Internet argues that Lawyers breached the insurance contract by failing to pay enough to cover the losses that resulted from First Internet having a junior lien on some lots.  The court agrees with Lawyers' method of calculating the amount owed under the contract.  Lawyers' motion for summary judgment on the contract claim is granted.

Before moving to the merits of the contract claim, the court must address Lawyers' argument that First Internet should be precluded from arguing breach of contract because of statements made by First Internet's Rule 30(b)(6) deponent. Lawyers points out that First Internet's Rule 30(b)(6) deponent testified that First Internet had no evidence to support any of its causes of action.  Lawyers also points out that First Internet's deponent advanced a theory of contract damages that is different from the theory First Internet advanced in its summary judgment brief.  Lawyers argues that First Internet's Rule 30(b)(6) deponent binds First Internet and prevents it from taking a different position at the summary judgment stage or at trial.  These issues are largely of Lawyers' own making.

Rule 30(b)(6) is intended to help a party seeking discovery from an institution (a corporation, government agency, labor union, etc.) to avoid a slow and expensive game of internal finger-pointing as one deponent after another says that he or she is not the person who knows the answer to the question. The party noticing the deposition must describe with "reasonable particularity" the matters for questioning. The deponent-organization must designate one or more persons who can speak for the deponent-organization about "information known or reasonably available to the organization." As a method for finding out facts known to an organization, Rule 30(b)(6) is not perfect, but it can be reasonably effective if all parties act in good faith.

In this case, Lawyers tried to use Rule 30(b)(6) in a very different way, by asking about legal theories and fact supporting the allegations in the complaint. In essence, this was an effort to use Rule 30(b)(6) as contention interrogatories are most often used. Lawyers noticed First Internet's Rule 30(b)(6) deposition early on in this litigation, before First Internet had the opportunity to complete its own discovery and develop fully its legal theory. Not surprisingly, the deponent's answers about the factual basis for the lawsuit and the legal theories were incomplete. Both the factual basis and the legal theories evolved. But Lawyers seeks to bind First Internet to the first incomplete answers.

This tactic has little to recommend it as a method for trying to lock an opponent into flawed and incomplete contentions and legal theories. A Rule

30(b)(6) deposition produces evidence, not judicial admissions.  A Rule 30(b)(6) deponent testifies as if she is the corporation, but Rule 30(b)(6) does not "absolutely bind a corporate party to its designee's recollection."  *A.I. Credit Corp. v. Legion Insurance Co.*, 265 F.3d 630, 637 (7th Cir. 2001).  Rule 30(b)(6) testimony "can be contradicted and used for impeachment purposes," but it "is not a judicial admission that ultimately decides an issue." *Industrial Hard Crome, Ltd. v. Hetran, Inc.*, 92 F. Supp. 2d 786, 791 (N.D. Ill. 2000); see also *State Farm Mutual Auto. Ins. Co. v. New Horizont, Inc.*, 250 F.R.D. 203, 213 (E.D. Pa. 2008) (denying summary judgment even though plaintiff's Rule 30(b)(6) deponent could not identify facts supporting its cause of action).[5]  Lawyers cannot preclude First Internet from arguing breach of contract by noticing the deposition at an early stage of this litigation.

Turning to the merits of the dispute, the parties offer competing interpretations of the insurance policy.  In general, Indiana courts interpreting insurance policies use the same rules of construction that apply to other contracts. *Kelly v. Hamilton*, 816 N.E.2d 1188, 1193 (Ind. App. 2004).  The court

_____

[5]The Rule 26 duty to supplement discovery does not apply to non-expert depositions.  See Fed. R. Civ. P. 26(e); Advisory Committee's Note to 1993 Amendment to Fed. R. Civ. P. 26.  Rule 30(b)(6) does not contain an explicit duty to supplement, but it does require the deponent to "testify about information known or reasonably available to the organization."  In this case it appears that First Internet's Rule 30(b)(6) deposition was a perfectly good mechanism for finding out factual matters known to the company, but for learning legal theories and contentions, it is not a fair substitute for asking interrogatories or using other mechanisms that give counsel an opportunity to ensure that the answers fairly lay out the legal and factual support for the claims or defenses.

must give clear and unambiguous terms their plain and ordinary meaning. *Id.* An insurance contract is ambiguous if it is "susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Id.*

The parties agree on several important issues and disagree on a narrow one. They agree that Lawyers insured that First Internet had the senior lien on the lots that secured the Royal Haven note. They agree that First Internet did not have the senior lien on several of the lots. They agree that the key provision in the insurance policy that governs whether Lawyers performed on the contract provides that the maximum amount of liability is "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

The parties disagree on *when* the difference in value should be determined.[6] First Internet argues that the difference should be determined as of the moment that it discovered the title defects. The parties agree that at least one First Internet officer, Perfetti, discovered that First Internet did not have the senior lien

---

[6]The parties also dispute whether First Internet waived its breach of contract argument when it failed to object to the bankruptcy court's liquidation plan for the lots on which it had a junior lien. The policy excludes all "defects, liens, encumbrances, adverse claims or other matters created, suffered, assumed, or agreed to by the insured." Dkt. No. 29, Ex. A at 1. First Internet's failure to object to the liquidation plan was not an assumption of or agreement to the loss. No evidence suggests that First Internet would have been in a better position by objecting to the bankruptcy court's liquidation plan, and Lawyers has not suggested what objection First Internet could have made successfully.

on many of the lots in approximately October 2002.  Lawyers argues that the difference should be determined as of the time the bankruptcy trustee sold the lots.  That is the measure that Lawyers used to pay First Internet, so Lawyers argues that it performed on the contract.

No reported Indiana appellate case has determined when "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by [the] policy" should be measured when the title insurance policy insures a mortgagee.  Courts in other jurisdictions have reached mixed results. See 12 Couch on Insurance § 185:77 (3d ed. 1998).[7]  The policy language does not specify when the date of loss should be determined, and the court finds the language to be ambiguous.  "An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning."  *Schilling v. Huntington County Cmty. School Corp.*, 898 N.E.2d 385, 388 (Ind. App. 2008).  A reasonable person could construe this provision to measure the date of loss on either the date of discovery or the date that the property was sold in foreclosure.

---

[7]Couch cited *Morris v. Chelsea Title & Guaranty Co.*, 171 A. 819 (N.J. 1934) (loss determined as of date the title failed in foreclosure proceedings); *Narberth Bldg. & Loan Ass'n v. Bryn Mawr Trust Co.*, 190 F. 149 (Pa. Super. 1937) (date of foreclosure); and *Title Ins. Co. of Richmond v. Industrial Bank of Richmond*, 157 S.E. 710 (1931) (date of demand for compensation under policy).

Indiana courts generally construe ambiguities in insurance contracts in favor of the insured, see, *e.g.*, *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000), but the context in this case favors adopting Lawyers' position that the time of sale should be used to determine the loss. First Internet's argument that the loss should be determined from the time of discovery might be more persuasive if it had owned the lots, rather than merely had a security lien on, them. First Internet cites cases from other jurisdictions using the date of discovery, but these cases involved title insurance policies issued to owners, not lenders. See, *e.g.*, *Overholtzer v. Northern Counties Title Ins. Co.*, 253 P.2d 116 (Cal. App. 1953) (owners sued title insurance company after discovering easement); *Swanson v. Safeco Title Ins. Co.*, 925 P.2d 1354 (Ariz. App. 1995) (owners sued title insurance company after discovering lien); see also 12 Couch on Insurance § 185:78 (noting that date of discovery of defect may be used to determine an owner's loss).

This policy was issued for liens on lots that secured only a mortgage. First Internet did not own the lots or have control over their disposition. The only way that First Internet could control the lots was if Royal Haven defaulted on the note. Of course, First Internet did not have the senior lien on all of the lots, so Lawyers had an obligation to indemnify First Internet, and it has done so. Lawyers paid First Internet what it would have received at foreclosure if it had held the senior lien. First Internet bargained to have perfect title in the event of a default and foreclosure, so the time of default and foreclosure is when damages should be

measured.  That is the approach that other courts have taken in cases involving lenders, while rejecting the time-of-discovery rule in such cases.  See *Marble Bank v. Commonwealth Land Title Ins. Co.*, 914 F. Supp. 1252, 1254 (E.D.N.C. 1996) ("Since a lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of that loss.").

A comparison of California cases shows why the loss for a title insurance policy should be measured at a different time for lenders and owners.  In *Overholtzer v. Northern Counties Title Ins. Co.*, 253 P.2d 116 (Cal. App. 1953), owners of a home sued a title insurance company after they discovered an easement across their property.  The court determined the plaintiffs' loss from the easement as of the date they discovered the easement.  253 P.2d at 130.  On the other hand, in *Karl v. Commonwealth Land Title Ins. Co.*, 24 Cal. Rptr. 2d 912 (Cal. App. 1993), plaintiffs had a title insurance policy for their security interest in a building and later discovered a senior tax lien.  The court distinguished *Overholtzer* because it concerned an owner's title rather than a lender's lien.  The *Karl* court held that the mortgage holder's insured losses should be determined as of the date of foreclosure.  The court explained:

> Since the insured lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of loss. Further, even though the lender's note is in default, an anticipated loss cannot be measured until completion of foreclosure because only then is there certainty the lender will not be paid in full.  Consequently, it is clear that in the typical case the earliest a loss can be claimed on a lender's policy is at the time of completion of foreclosure.

24 Cal. Rptr. 2d 919-20 (footnotes omited).[8]  Accord, *Hodas v. First American Title Ins. Co.*, 696 A.2d 1095, 1097 (Me. 1997) ("The presence of a title defect immediately results in a loss to the holder of a fee interest since resale value will always reflect the cost of removing the defect.  In contrast, the holder of a loan policy incurs a loss only if the security for the loan proves inadequate to pay off the underlying insured debt due to the presence of undisclosed defects.").

Similar ambiguities in title insurance policies have been addressed repeatedly by courts in other jurisdictions.  They have consistently rejected suggestions that loss should be determined as of the date the policy was issued or the date the possible future loss was discovered.  The better reasoned cases have instead determined loss in a lender's title insurance policy at the date of foreclosure.  Using an earlier date would necessarily require speculation and estimation about the value of the property before it is even certain whether the lender will suffer a loss, while the date of foreclosure provides a value and loss amount based on a real transaction.  This rule to use the date of foreclosure does not systematically favor the insurer or the lender.  Market conditions determine which party benefits from the date-of-foreclosure rule.  This court predicts that Indiana would follow the consensus view that the loss in a title insurance policy for a mortgage holder is determined at the date of foreclosure.

---

[8]In *Karl* a lender obtained the property after foreclosure and later sold the property.  In that case the court held that the loss should be determined as of the date of foreclosure, not the later date of sale.  That situation is not present in this case.  The only dispositions of property in this case were the trustee's sales, so the losses should be measured as of those dates.

There are two final details on the contract claim.  While the court agrees with Lawyers' damages theory, First Internet argues that the amount owed by Lawyers should include Harvest Ridge Lot 80 and Harvest Ridge Lot 139.  First Internet had two liens on Lot 80; its lien secured by this policy was junior.  First Internet also still has a junior lien on Lot 139.  That lot is owned by an affiliate of Royal Haven that has not sought bankruptcy.

Lawyers argues that the court should ignore First Internet's argument that Lawyers owes it for Lot 80 because First Internet omitted Lot 80 from a complaint attachment listing lots that serve as the basis of its claim against Lawyers.  The court agrees that the omission precludes First Internet from arguing that Lawyers should pay it for Lot 80.  (Unlike a witness on the spot in a Rule 30(b)(6) deposition, First Internet and its legal team had ample time to ensure that the list of properties attached to the complaint was complete and accurate.)

First Internet may be able to recover for Lot 139, which was listed in the attachment.  However, because Lot 139 has not been foreclosed or sold, First Internet's contract claim on the lot is not ripe.  *E.g.*, *Karl*, 24 Cal. Rptr. 2d at 919-20 (discovery of insured-against lien does not trigger recognition of loss; claim is not ripe until foreclosure is completed).[9]

---

[9]First Internet also argues that it suffered a loss even on the lots where it had the senior lien.  It argues that the title problems on some of the lots depressed the value of all the lots.  The court disagrees.  First Internet presents no evidence that the lots were sold with any title blemishes.  The lots were going to be sold

(continued...)

II.     *Tort Claims*

First Internet makes six tort claims against Lawyers: negligence, breach of fiduciary duty, constructive trust, conversion, actual fraud, and constructive fraud. Lawyers moved for summary judgment on each of these claims. First Internet's response and its motion for summary judgment do not address the constructive trust or actual fraud claims, conceding the points. Lawyers is also entitled to summary judgment on the other claims.

All of the torts arise from Mara Vittetow's acts as a closing agent for Abstract. In its brief, First Internet argues that Vittetow acted tortiously when she failed to use its checks to remove the senior liens from many of the lots. First Internet imputes this tortious conduct to Vittetow's employer, Abstract, and argues that Abstract was Lawyers' agent so that Lawyers is responsible for Abstract's torts (which are actually Vittetow's torts). See generally Pl. Br. 31-38 (explaining its theories of liability on the torts). Lawyers argues that the complaint focused on its own allegedly tortious acts and that First Internet's summary judgment brief essentially raises new claims by focusing on the conduct of Vittetow and Abstract. Ordinarily, a party may not amend its complaint through a summary judgment brief, but it is not uncommon for legal theories to be refined

---

[9](...continued)

regardless of whether First Internet had the senior lien on them. Absent a contrary indication from the parties, the court assumes that the senior lien on each of the lots was foreclosed. When this occurred the junior liens were wiped out, so the presence of multiple liens on the lots did not affect their value after foreclosure.

at the summary judgment phase of a case.  First Internet's complaint includes several references to Abstract's conduct.  Lawyers is the only named defendant, and the complaint refers to Abstract as Lawyers' "agent" several times.  The complaint indicated sufficiently that First Internet sought to hold Lawyers liable for Abstract's acts.

The parties dispute whether Lawyers can be liable for Vittetow's and Abstract's acts.  The court does not reach this issue because, for varying reasons, First Internet has no viable causes of action even if Vittetow's and Abstract's acts and omissions can be imputed to Lawyers.

A.      *Negligence and Breach of Fiduciary Duty*

The "economic loss" doctrine under Indiana law bars First Internet's claims for negligence claim and breach of fiduciary duty.  The economic loss doctrine in tort law is a response to efforts by plaintiffs to avoid contract law and its limitations by trying to transform breaches of contract into torts.  Under the economic loss doctrine in Indiana, "damage from a defective product or service may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected."  *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153

-18-

(Ind. 2005).[10]  First Internet has not alleged any personal injury from Abstract's and Vittetow's allegedly tortious acts, and the damage to First Internet's security interest in the lots was not damage to "other property" because First Internet obtained the loan closing services in the same transaction through which it obtained the security interests.

In *Gunkel*, the plaintiffs entered into a home construction contract and six months later contracted with another company to install a stone facade on the house.[11]  The facade was defective and caused water damage to the rest of the house.  The plaintiffs sued the company that installed the facade for negligence.  The Indiana Supreme Court explained that damage caused by one component service to another component of a transaction is not recoverable in a tort action:

> Only the supplier furnishing the defective property or service is in a position to bargain with the purchaser for allocation of the risk that the product or service will not perform as expected.  If a component is sold to the first user as a part of the finished product, the consequences of its failure are fully within the rationale of the economic loss doctrine.  It therefore is not "other property."   But property acquired separately from the defective good or service is "other property," whether or not it is, or is intended to be, incorporated into the same physical object.

---

[10]In *Gunkel*, the Indiana Supreme Court agreed with the Seventh Circuit that the phrase "economic loss" is not a helpful description, but stuck with the phrase because it has been so widely adopted.  822 N.E.2d at 152, citing *Miller v. United States Steel Corp.*, 902 F.2d 573, 574 (7th Cir. 1990).

[11]Despite First Internet's contrary assertion at oral argument, the economic loss doctrine applies to – in fact, it is designed for – parties in privity with each other.

*Id.* at 155.  Because the facade was purchased in an arrangement "independent" of the contract to build the rest of the house, the damage to other parts of the house was damage to "other property" and could be the basis for a tort claim.  But damage to the facade itself was subject to the economic loss doctrine, and the issue was covered by the applicable contract.

The injury in this case was to the security interest, and the loan closing and the acquisition of a security interest were part of the same transaction.  The improper loan closings damaged the security interest, but this damage falls squarely within the economic loss doctrine, is covered by the contract, and is not recoverable in a tort action.

The economic loss doctrine is particularly appropriate in this case because Lawyers compensated First Internet for its damages when it paid First Internet on the contract claim.  If Vittetow had closed the loans properly, First Internet would have had the senior lien on all the lots and would have received the proceeds of the trustee's sales of the lots.  Lawyers paid First Internet what it would have received from the trustee if it would have had the senior lien.  The rationale for the economic loss doctrine is that purely economic injuries between contracting parties should be redressed in contract actions.  First Internet's economic injuries were redressed pursuant to its contract with Lawyers.  It cannot recover again in a negligence or breach of fiduciary duty action.

First Internet's negligence and breach of fiduciary duty claims fail for a second reason:  they are barred by Indiana's two-year statute of limitations for injury to personal property.  See Ind. Code § 34-11-2-4(2).  First Internet does not dispute that if the two-year statute of limitations applies then it cannot maintain its negligence and breach of fiduciary duty claims.  However, First Internet argues that these claims are governed by Indiana's six-year statute of limitations for injury to property other than personal property.  Ind. Code § 34-11-2-7(3).

First Internet's theory is that Abstract was negligent because of Vittetow's acts at and immediately following the loan closing with Royal Haven in 2001.  First Internet claims that Vittetow failed to ensure that it had the senior lien on all of the lots.  This "resulted in a cloud on [First Internet's] interest in the Lots" that deprived First Internet of its collateral.  Pl. Br. 32.  First Internet claims that Abstract breached a fiduciary duty through the same conduct that gave rise to the negligence claim.  Its "damages for Abstract's breach of fiduciary duty [are] the same as its negligence losses."  Pl. Br. 33.

The two-year statute of limitations applies to the negligence and breach of fiduciary duty claims.  The application of Indiana's statutes of limitations depends on the type of "injury" suffered.  See *Whitehouse v. Quinn*, 477 N.E.2d 270, 274 (Ind. 1985) ("The substance of a cause of action is ascertained by an inquiry into the nature of the alleged harm and not by reference to theories of recovery advanced in the complaint.").  The issue here is whether First Internet is alleging

injury to personal property or real property.  The lots at issue are real property, but First Internet does not allege any injury to the lots.  It alleges an injury to its security interest in title to the lots.

First Internet's negligence and breach of fiduciary duty claims relate to real property, but the security interest was personal property.  In Indiana, a mortgagee has no title in the land mortgaged until foreclosure:  "The right to possession, use and enjoyment of the mortgaged property, as well as title, remains in the mortgagor, unless otherwise specifically provided, and the mortgage is a mere security for the debt."  *Egbert v. Egbert*, 132 N.E.2d 910, 918 (Ind. 1956), quoting *Oldham v. Noble*, 66 N.E.2d 614, 617 (Ind. App. 1946).  First Internet's contingent, future right to the lots was not a sufficient interest to be real property as the term is commonly understood.  See Restatement (First) of Property § 8 (1936) (defining real property as fee simple estates).  Because the security interest was not real property, it was personal property.  See *University of Southern Indiana Found. v. Baker*, 843 N.E.2d 528, 532, 534 (Ind. 2006) (agreeing that technical definition of personal property is "any movable or intangible thing that is subject to ownership and not classified as real property," but rejecting application of the definition to the contract being interpreted), quoting Black's Law Dictionary 1254 (8th ed. 2004).  Thus the claims for injury to the security interest are governed by the two-year statute of limitations for injury to personal property.[12]   The statute of

---

[12]Lawyers cites *Lee Tool & Mould, Ltd. v. Fort Wayne Pools, Inc.*, 791 F.2d 605 (7th Cir. 1986), for the proposition that the two-year statute of limitations applies (continued...)

limitations began to run when First Internet "knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act." *Filip v. Block*, 879 N.E.2d 1076, 1082 (Ind. 2008), quoting *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992).  At the latest, First Internet knew of its injury in 2003 when the trustee began to sell the lots. It did not file its complaint until 2007, more than two years later.  Its negligence and breach of fiduciary duty claims are barred by the statute of limitations.[13]

### B.   *Conversion/Misappropriation*

First Internet's conversion claim is based on Indiana Code § 35-43-9-7(a), which reads:

> An officer, a director, or an employee of a title insurer, an individual associated with the title insurer as an independent contractor, or a title insurance agent who knowingly or intentionally:
>
> (1) converts or misappropriates money received or held in a title insurance escrow account; or
>
> (2) receives or conspires to receive money described in subdivision (1);
>
> commits a Class D felony . . . .

---

[12](...continued)
to a claim of title or lien in property.  *Lee Tool* applied the two-year statute of limitations to a claim of conversion of an industrial mould, which was not real property.  The reasoning does not apply here.

[13]The exception is any claim based on Harvest Ridge Lot 139.  Because there has been no foreclosure on that lot, First Internet's claims based on that lot are not yet ripe, let alone barred by statutes of limitations.

-23-

Companies can be liable criminally when their agents violate § 7 by acts within the scope of their employment, and companies can be liable civilly for losses caused by their crimes.   Ind. Code §§ 34-24-3-1, 35-41-2-3(a); *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 637 (7th Cir. 1987) (holding that these statutes "create a statutory version of respondeat superior" so that a company may be civilly liable for the conversion crimes of its agents committed in furtherance of their employment).

First Internet argues that Vittetow committed criminal conversion or misappropriation and that Lawyers is liable for treble damages for her crime.  First Internet conceded at oral argument that § 7 does not support its conversion claim. To be liable under § 7, the actor must "convert or misappropriate money received or held in a title insurance escrow account."  A "title insurance escrow account" is defined as "an account in which written instruments, money, or other items are deposited and held in escrow or trust for disbursement to a party in connection with a residential real property transaction . . . ."  Ind. Code § 35-43-9-5. "Residential real property transaction," in turn, is defined as "the purchase, sale, or refinancing of a dwelling that has been or will be the residence of a party . . . ."  Ind. Code § 35-43-9-3.  First Internet has designated no evidence showing that Vittetow converted or misappropriated money that was held in connection with "the purchase, sale, or refinancing of a *dwelling* that has been or will be the *residence* of a party . . . ."  The real estate in question consisted of lots for future residential development.  They were not yet dwellings, and there is no evidence

-24-

that any party involved in this case intended to live in dwellings on any of these lots.  The lots were used as security, not as residences.  First Internet cannot pursue its conversion claim.[14]

### C.    *Constructive Fraud*

The last claim to discuss is the constructive fraud claim.[15]  First Internet claims that Lawyers and Abstract committed constructive fraud by making material misrepresentations about paying off senior liens and by gaining a financial advantage based on these misrepresentations.  This claim fails because Lawyers did not receive a benefit by virtue of Vittetow's allegedly fraudulent acts.

Under Indiana law, constructive fraud arises by operation of law when a party would otherwise obtain an unconscionable advantage over another. *Allison v. Union Hospital, Inc.*, 883 N.E.2d 113, 122 (Ind. App. 2008).  There is no intent requirement.  *Id.*  The elements of constructive fraud are:  (1) a duty existing by virtue of the relationship between the parties; (2) a violation of that duty by making deceptive material misrepresentations of past or existing facts or

---

[14]Even if the language supported this cause of action, it would be barred by the two-year statute of limitations for injury to personal property.  See *Browning v. Walters*, 616 N.E.2d 1040, 1045-47 (Ind. App. 1993) (statute of limitations for civil enforcement of criminal violation dependent on the nature of the harm, not by the statute of limitations for the underlying crime).

[15]Lawyers does not argue that the statute of limitations bars this claim.  The statute of limitations for fraud claims, including constructive fraud claims, is six years.  See Ind. Code § 34-11-2-7(4); *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. App. 1998).

remaining silent when the duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result of the reliance; and (5) an advantage by the party to be charged at the expense of the complaining party. *Id.* at 123.[16]

First Internet has not come forward with evidence sufficient to support a finding that Vittetow, Abstract, or Lawyers gained an unconscionable advantage by virtue of any misrepresentation. First Internet has designated no evidence to show that Vittetow, the alleged tortfeasor, gained an advantage when she gave money to Tauer instead of using it to pay off senior liens. Abstract received only the standard closing fee. It did not receive any additional funds because of the alleged misappropriation. Lawyers also received no additional fee because of the alleged misappropriation. The allegedly misappropriated money went to Tauer. Lawyers is entitled to summary judgment on this claim.

---

[16]Under Indiana law, a false representation about future conduct can give rise to a claim for constructive fraud, but not for common law fraud. *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 281 (Ind. App. 2005).

*Conclusion*

Lawyers' motion for summary judgment is granted.  Dkt. No. 33.  For the contract claim on Harvest Ridge Lot 139, it is granted for lack of ripeness, not on the merits.  First Internet's cross-motion for partial summary judgment is denied. Dkt. No. 58.  The court will enter final judgment accordingly.


        So ordered.

Date:  July 13, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana


Copies to:

David J. Jurkiewicz
BOSE MCKINNEY & EVANS, LLP
djurkiewicz@boselaw.com

Scott Stuart Morrisson
KRIEG DEVAULT LLP
smorrisson@kdlegal.com

Matthew R. Strzynski
KRIEG DEVAULT LLP
mstrzynski@kdlegal.com

Carina M. de la Torre
BOSE MCKINNEY & EVANS, LLP
cdelatorre@boselaw.com